UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE



FILED

FEB 03 2021

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

| | |
|---|---|
| IN THE MATTER OF THE ) | No. **3:21-mc-5001** |
| APPLICATION OF THE UNITED ) | Judge **Varlan** |
| STATES OF AMERICA FOR AN ) | |
| ORDER AUTHORIZING THE INITIAL ) | **TO BE FILED UNDER SEAL** |
| INTERCEPTION OF WIRE ) | |
| COMMUNICATIONS ) | |
| OVER A CELLULAR TELEPHONE ) | |
| ASSIGNED TELEPHONE NUMBER ) | |
| (865) 722-2019 AND INTERNATIONAL ) | |
| MOBILE EQUIPMENT IDENTITY ("IMEI") ) | |
| NUMBER 015750001644692 ) | |

## AFFIDAVIT IN SUPPORT OF APPLICATION

### I.     INTRODUCTION

Special Agent Peter G. Wooden, being duly sworn, depose and state the following:

1)      I am a Special Agent of the Drug Enforcement Administration ("DEA"), United States

Department of Justice.  I have been so employed since September 2010.  As such, I am a law

enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) and am

empowered by law to conduct investigations, and to make arrests by law to conduct

investigations, and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2)      My experience as a special agent includes, but is not limited to, conducting physical

surveillance, interviewing witnesses, writing affidavits for and executing search warrants,

working with undercover agents and informants, issuing administrative and federal grand jury

subpoenas, and analyzing financial records, telephone records, and data derived from the use of

pen registers, trap and traces, and wiretaps, and assisting in wiretap investigations.

3)      I have received training and am experienced in the investigations of violations of the

Exhibit 2

federal drug and money laundering laws. As a result, I am familiar with matters including but not limited to, the means and methods used by persons and drug trafficking organizations ("DTOs") to purchase, transport, store, and distribute drugs and to hide profits generated from those transactions. I also have experience in analyzing and interpreting coded dialogue and communication used by drug traffickers.

4)      I know, based upon my training and experience, as well as information relayed to me during the course of my official duties, that members of DTOs routinely utilize wire and electronic communications facilities, including cellular telephones, push-to-talk two-way radios, public telephones, and other electronic devices to communicate operational directives and information concerning the conduct of the organization's illegal activities to other organization members. During the course of these communications, organization members routinely utilized coded references concerning their illegal activities in an effort to avoid detection by law enforcement. I know, based upon my training and experience, that the communication of time-sensitive information is critical to the success of an organization's illegal activities. The critical nature of this information stems from the necessity of the organization's management to provide direction for the importation, storage, transportation, and distribution of narcotics, as well as the subsequent laundering of the proceeds of these illegal activities. Finally, I also know that narcotics traffickers routinely use prepaid telephones requiring no subscriber information, and often use fictitious names or the names of other individuals to register telephones, vehicles, real property, and utility services in order to avoid detection by law enforcement.

5)      At the present time, I am participating in an investigation of a cocaine trafficking organization, which operates in Tennessee, Puerto Rico, and elsewhere. The case is being investigated by the DEA, Knox County Sheriff's Office ("KCSO"), The United States Postal

Inspection Service ("USPIS"), and other federal, state, and local law enforcement agencies. Information contained within this affidavit is based upon my personal knowledge and participation in this investigation, and upon information I believe to be reliable from the following sources:

a) Oral and written reports and documents about this and other investigations that I have received from members of DEA, KCSO, USPIS, and other federal, state, and local law enforcement agencies;

b) Physical surveillance conducted by DEA, KCSO and other federal, state, and local law enforcement agencies that has been reported to me either directly or indirectly;

c) Confidential source;

d) Public records;

e) Subpoenaed information from FedEx;

f) A review of pen register information, telephone toll records, caller identification information and subscriber information; and

g) Consensually recorded calls.

6) Because this Affidavit is being submitted for the limited purpose of securing authorization for the interception and recording of the requested wire communications, I have not included each and every fact known to me concerning the underlying investigation. I have set forth only the facts that I believe are essential to establish probable cause for an Order authorizing the interception and recording of wire communications described in this Affidavit. I do not request that this Court rely upon any facts not set forth herein in reviewing this Affidavit or the accompanying Application for the interception and recording of wire communications.

7) This Affidavit is made in support of an application for an order pursuant to 18 U.S.C. § 2518, authorizing the initial interception and recording for a 30-day period of wire communications occurring to and from a cellular telephone assigned telephone number (865) 722-2019 and International Mobile Equipment Identity ("IMEI") Number 015750001644692

(hereinafter referred to as "**Target Telephone 1**").

8)     Based on this investigation, I believe that **Target Telephone 1** is being used, and will continue to be used, to facilitate drug trafficking crimes in the Eastern District of Tennessee, and elsewhere.  Intercepted communications will first be heard and minimized at the DEA office in Knoxville, Tennessee.

9)  Records received from Verizon Wireless indicated that **Target Telephone 1** is subscribed to reseller TracFone.  On January 8, 2020, agents received subscriber information from TracFone which indicated **Target Telephone 1** was a prepaid telephone with no subscriber name, customer ID: 1390105403, and an address of "Knoxville, TN 37917[1].  Based on TracFone and Verizon records, **Target Telephone 1** was activated September 19, 2020.  The authorization given is intended to apply not only to the target telephone number listed above, but also to any other telephone number subsequently assigned to or used by the instrument bearing the same IMEI number used by **Target Telephone 1**, and to any other international mobile equipment identification number to which the target telephone number referenced above is assigned, within the thirty-day period.  The authorization is also intended to apply to the target telephone number referenced above regardless of service provider, and to background conversations intercepted in the vicinity of **Target Telephone 1** while the telephone is off the hook or otherwise in use.  In this instance, Target Telephone number 865-722-2019 is the current telephone number used; however, it is common for individuals involved in the illegal narcotic trafficking trade to change cellular telephone devices and/or to change telephone numbers in an attempt to evade law enforcement investigations.  As

---

[1] According to TracFone, TracFone is a prepaid phone service, and subscriber information is not required from their customers at activation.  In addition to a customer ID and City, State information within the subscriber details, TracFone records also provided a date of birth of 12/09/1964.  This is not the DOB of CAMPBELL, however agents learned this was the DOB for RICHARD LANXTER, CAMPBELL's top contact according to Toll Records.

reflected in this affidavit, **Target Telephone 1** is used and possessed by RONNIE EUGENE CAMPBELL JR. ("CAMPBELL"), with service through Verizon Wireless.

10)     This affidavit is based on my personal knowledge and participation in this investigation, as well as through interviews and analysis of reports, both written and verbal, provided by other federal, state, and local law enforcement officers and employees during the course of their official duties and through the analysis of telephone toll information and other information within the investigation. On the basis of my personal participation, knowledge of and familiarity with this investigation, and on the basis of other information, which I have reviewed and determined to be reliable, I allege that:

a)     There is probable cause to believe that CAMPBELL, MARCOS AUGUSTO MARCANO ROMAN ("MARCANO ROMAN"), RICHARD LANXTER ("LANXTER"), TREVOR WARREN ("WARREN"), and others as yet unknown or unidentified (hereinafter referred to as "Target Interceptees"), have committed, are committing, and will continue to commit, offenses enumerated in Title 18 Unites States Code, Section 2516, that is, offenses involving violation of:

i)    Distributing and possessing with intent to distribute cocaine, and the conspiracy to distribute and to possess with intent to distribute cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841 and 846.

ii)   Use of a communications facility to commit, cause and facilitate drug trafficking activity, in violation of Title 21, United States Code, Section 843(b);

iii)  Maintaining a place for manufacture, distribution, or use of controlled substances, in violation of Title 21, United States Code, Section 856;

iv)   Conducting or attempting to conduct financial transactions with the proceeds of a specified unlawful activity with the intent to promote the specified unlawful activity or to conceal or disguise the proceeds; and the conspiracy to conduct or to attempt to conduct such financial transactions, in violation of

Title 18, United States Code, Section 1956(a)(1) and 1956(h);

v) Carrying a firearm during and in relation to a drug trafficking crime, or use of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c); and

vi) Aiding, abetting, counseling, commanding, inducing or procuring the commission of any of the above offenses against the United States, in violation of Title 18, United States Code, Section 2(a).[2]

b) There is probable cause to believe that particular wire communications of Target Interceptees, and others yet unknown, concerning the above described federal felony offenses will be obtained through the interception of such communications over **Target Telephone 1**. In particular, these communications are expected to reveal evidence of the above federal felony offenses committed by the targets of the investigations and the dates, times, and places of the commission of the aforementioned federal felony offenses of the individuals identified above, along with their suppliers, co-conspirators, aiders, abettors, and other participants in the conspiracy, thereby identifying the suppliers, coconspirators, aiders, and abettors and others yet unknown, as well as their places of operation, distribution of contraband and money involved in the illegal activity and the location of the resources used to finance the illegal activity. Among other things, these wire communications will provide the identities and roles of participants in the illegal controlled substance distribution and trafficking organization; the manner in which this illegal controlled substance distribution organization operates; the identification of the illegal conduct; the identification of the nature and methods of the managing and financing of the controlled substance distribution organization; the locations of any controlled substance stash and controlled substance warehouses; the suppliers of the controlled substance; the identification

---

[2] Although aiding and abetting under 18 U.S.C.§2 is not a predicate offense for Title III interception enumerated in 18 U.S.C. § 2516, there also is probable cause to believe that the Target Subjects of the investigation have aided and abetted and are aiding and abetting the substantive offenses listed.

Case 3:21-mc-05001-TAV   Document 2   Filed 03/24/21   Page 6 of 56   PageID #: 21

and location of future controlled substance transactions; the identification of controlled substance distribution methods; the identification and location of evidence of controlled substance transactions, financial records and other records reflecting the occurrence of controlled substance transactions, and monies being used to finance and conduct the controlled substance transactions; and the identification of other individuals not yet identified who are participating in, directing, or deriving financial profit and benefit from the illegal controlled substance distribution business; and the identity of which telephone, telephones, and/or other communication device or devices, if any, is or are being used by the targets of this investigation and other yet unknown, to direct others in the conspiracy to distribute controlled substances. In addition, in my opinion, the wire communications are expected to constitute admissible evidence of the commission of the above-cited offenses.

  c)  Normal investigative procedures have been tried and have failed, reasonably appear unlikely to succeed if tried, or are too dangerous to employ, as is described herein in further detail.

  d)  There is probable cause to believe that **Target Telephone 1** is being and will continue to be used in connection with the commission of the above described offenses.

  e)  I believe intercepting **Target Telephone 1** will provide evidence that will lead to the complete dismantling of the DTO. As reflected later in this affidavit, CAMPBELL coordinates the distribution of cocaine for MARCANO ROMAN, the local source of supply. Officers of the KCSO have identified 2709 Tecoma Drive, Knoxville, Tennessee, as the residence of CAMPBELL and where all of the controlled purchases have occurred.

11)  The statements contained in this affidavit are based in part on information provided by law enforcement agents with the DEA, KCSO, USPIS, and other law enforcement agencies; on

information provided by confidential sources; on other information noted herein, and on my experience and background as a Special Agent with the DEA. Since this affidavit is being submitted for the limited purpose of securing authorization for the interception of wire communications, I have not included each and every fact known to me concerning the investigation. I have set forth only the facts I believe are necessary to establish the necessary foundation for an order authorizing the interception of wire communications. I know that persons engaged in drug trafficking maintain contact with other persons involved in such illegal activities, and that the use of telephones is essential to maintain such contact.

## II.    INVESTIGATIVE OBJECTIVES

12)    There is probable cause to believe that particular communications of the Target Interceptees concerning the above offenses will be obtained through the requested interception of wire communications for which authorization is herein sought. In particular, there is probable cause to believe that these communications will concern the specifics of the above offenses, including:

a)    The nature, extent, and methods of operation of the illegal drug trafficking and money laundering of the Target Interceptees;

b)    The nature and extent of the mechanism used by the Target Interceptees to import, transport, and distribute controlled substances within the Eastern District of Tennessee, and elsewhere;

c)    The identities of co-conspirators, accomplices, aiders and abettors, and other participants operating in concert with the Target Interceptees, and their respective roles and participation in the above-mentioned offenses;

d)    The identification of other communications facilities used by the Target

Interceptees in furtherance of the criminal activity alleged herein;

e)      The identities of the sources of supply of the controlled substances distributed by the Target Interceptees;

f)      The locations where the controlled substances are stored;

g)      The methods and means of payment for the controlled substances employed by the Target Interceptees, and the manner in which these transactions are conducted;

h)      The dates, times, places, and manner in which controlled substances and the proceeds of drug trafficking are being delivered to the Target Interceptees;

i)      The methods and means by which the target Interceptees dispose of and invest the proceeds from the sale of controlled substances; and

j)      The location and source of resources used to finance the illegal activities described herein.

13)      In addition, these communications are expected to constitute admissible evidence of the commission of the above-described offenses. It is further expected that interception of the requested communications, if authorized, will provide valuable evidence against the perpetrators of the above-described offenses that cannot reasonably be obtained by other means. These interceptions will help meet all of the above-listed goals of this investigation. Based on my training and experience, I do not believe that this DTO can be dismantled without the interception of the requested communications.

14)      The nature of this investigation is such that there is probable cause to believe that additional communications of the same type will continue to occur after the described type of communications have been first obtained.

### III. PERSONS EXPECTED TO BE INTERCEPTED

15)     RONNIE EUGENE CAMPBELL JR – CAMPBELL has a 2005 arrest for simple possession, a 2014 arrest for manufacture, delivery, sale, or possession of a Schedule VI controlled substance.  CAMPBELL is a leader of the organization and is the primary facilitator for the distribution of cocaine within this organization in the Eastern District of Tennessee. CAMPBELL is the user of **Target Telephone 1** and is believed to coordinate the delivery and distribution of multiple ounce quantities of cocaine for Marcos Augusto MARCANO ROMAN to drug customers in the Eastern District of Tennessee.

16)     MARCOS AUGUSTO MARCANO ROMAN – MARCANO ROMAN is a multi-ounce distributor of cocaine within this organization in the Eastern District of Tennessee.   During controlled purchases, MARCANO ROMAN delivered the cocaine to the KCSO Confidential Source ("CS-1").  MARCANO ROMAN is believed to be the user of telephone number (865) 235-5008, a telephone subscribed to "MARCOS MARCANO" at 4813 Summit Circle, Knoxville, Tennessee.   (865) 235-5008 is a number frequently in contact with CAMPBELL at **Target Telephone 1**.

17)     RICHARD LANXTER – LANXTER has prior convictions for possession of Schedule II, possession of crack cocaine, possession of drug paraphernalia, and possession of cocaine with intent to deliver and was sentenced to 164 months – all occurring in Knoxville, TN.  LANXTER has a history of probation violations and evading arrest.  LANXTER is believed to be the user of telephone numbers 615-231-0674 and 865-415-9094.  Based on records from Verizon Wireless, 615-231-0674 is subscribed to LANXTER.  Based on records from T-Mobile, 865-415-9094 is also subscribed to LANXTER.  Both of the above referenced telephone numbers are in frequent communication with **Target Telephone 1**.

18)     TREVOR WARREN – WARREN has prior convictions for simple possession, possession of Schedule IV for resale, and felony possession of cocaine with intent to deliver and was sentenced to 8 years, all in Knoxville, TN. Additionally, WARREN has a history of transporting firearms by a felon (Wythe Co., VA) and criminal possession of a weapon and criminal possession of controlled substance (NYPD). Based on a query of Knoxville Police Department (KPD) reporting system, telephone number 865-232-6111 has been linked to WARREN, and is frequent communication with **Target Telephone 1**.

## IV.     PRIOR INTERCEPTION

19)     Based upon electronic surveillance ("ELSUR") record checks of the DEA, Homeland Security Investigation ("HSI"), Bureau of Alcohol Tobacco Firearms and Explosives ("ATF") and Federal Bureau of Investigation ("FBI") indices on January 11, 2021, there have been no other federal applications for an order authorizing or approving the interception of wire, oral, or electronic communications to or from **Target Telephone 1** or for any of the Target Subjects specified in this affidavit.

## V.     CONFIDENTIAL SOURCES AND OTHER SOURCES OF INFORMATION

20)     I have included in this affidavit information provided by confidential sources ("CS"). A CS may be referred to in the masculine form; however, this reference is not necessarily an indication of the true gender of the confidential source, so as to protect the identity of such sources.

21)     Confidential Source 1 (hereinafter referred to as "CS-1") has previously been arrested on property crime related and drug-related offenses, as well as offenses involving firearms. CS-1 is a reliable confidential source that has provided accurate, truthful, and detailed information to officers with the KCSO. CS-1 has a 2016 arrest for theft of property greater than $500 and

domestic assault. In 2007 CS1 was arrested for possession of cocaine with intent to sell/redistribute and unlawful possession of a weapon, to which he was sentenced to 96 months imprisonment following a plea of guilty. Additionally, in 2007, CS-1 was arrested for driving without a license. In 2005 CS-1 was arrested for possession of a firearm with intent to go armed. In 2004 CS-1 was arrested for criminal impersonation. CS-1 is familiar with illegal drug terms and has shown knowledge of narcotics to include cocaine, its appearance, color, and methods of distribution. CS-1 has been a documented confidential source for KCSO since September 2020.

22)    CS-1 has provided information regarding the illegal activities of CAMPBELL and MARCANO ROMAN. CS-1 identified CAMPBELL as a "middle-man" for MARCANO ROMAN. Additionally, CS-1 stated CS-1 had previously purchased cocaine from CAMPBELL and MARCANO ROMAN. CS-1 explained that CS-1 would contact CAMPBELL to negotiate the purchase of cocaine and when CS-1 would go to CAMPBELL's residence MARCANO ROMAN would deliver the cocaine. CS-1 informed agents that CS-1 obtained approximately eight to 10 ounces of cocaine a week from CAMPBELL and MARCANO.

23)    Agents have determined the information provided by CS-1 has been accurate, reliable, and truthful through independent investigation and corroboration, including the use of consensual recordings, physical surveillance, controlled purchases and knowledge previously acquired by agents. Officer Tanner Vittatoe of KCSO's Narcotics Division has informed me that CS-1 has been responsible for making consensual recorded telephone calls, providing drug related information, and conducting controlled purchases while under the control of KCSO. I believe that the information supplied by CS-1 is truthful, reliable, and accurate. CS-1 is cooperating with law enforcement in this investigation for potential consideration with criminal charges as well as for financial gain. No promises or guarantees of reduction or dismissal of

criminal charges have been made to CS-1 in exchange for CS-1's cooperation.

24)     Confidential Source 2 (hereinafter referred to as "CS-2") has previously been arrested in Tennessee on various offenses including a 2013 arrest for possession of drug paraphernalia and aggravated assault. Additionally, CS-2 was arrested in 2012 for driving without a license. CS-2 is believed to be a reliable confidential source that provided accurate, truthful, detailed, and reliable information to officers with the KCSO Narcotics Division. CS-2 has cooperated with the KCSO for monetary means since January 2019. CS-2 is familiar with illegal drug terms and has shown knowledge of narcotics to include cocaine, its appearance, color, and methods of distribution. CS-2 has been associated with cocaine traffickers, and suppliers. CS-2 has provided truthful information to the KCSO that has resulted in at least two successful search warrants that yielded arrests and illegal drug seizures, with the most recent leading to the discovery of at least three ounces of cocaine and over $14,000 in suspected illegal drug funds.

25)     CS-2 has provided information regarding the illegal activities of MARCANO ROMAN. CS-2 identified MARCANO ROMAN as a multi-ounce cocaine supplier to various retail drug dealers throughout the Knoxville, Tennessee area. Furthermore, CS-2 has been aware of MARCANO ROMAN's activities for approximately three years. CS-2 identified MARCANO ROMAN as a source of supply in two different cases in which CS-2 previously assisted the KCSO.

### VI.     BACKGROUND OF INVESTIGATION

26)     In September 2020, KCSO initiated a criminal investigation into the distribution of cocaine in the Eastern District of Tennessee. During the course of the investigation, officers quickly learned of the cocaine trafficking activities led by MARCANO ROMAN. The investigation into the CAMPBELL and the MARCANO ROMAN DTO was conducted by the

DEA, KCSO, the United States Postal Inspection Service ("USPIS"), and multiple other state and local agencies.

27)     The investigation was initiated when CS-2 informed officers about an individual selling crack cocaine. After three controlled buys from this individual throughout a three week span in September, a search warrant was executed at his residence, as well as the location he had been selling illegal drugs at, commonly referred to as a "trap house." Officers located approximately 100 grams of cocaine, illegal drug proceeds ($14,424), and various firearms. The individual on whom the search warrant was conducted decided to cooperate with law enforcement officers, and will here on out be referred to as CS-1. On the day of the search warrant CS-1 travelled with officers to the location he had been purchasing his cocaine from, 2709 Tecoma Drive, from a Hispanic male.

28)     Based on the investigation, agents have learned that MARCANO ROMAN is responsible for distributing multi-ounce quantities of cocaine in the Eastern District of Tennessee. During the investigation, CAMPBELL, a middle-man for MARCANO ROMAN, has utilized **Target Telephone 1** to set-up and conduct multi-ounce cocaine drug transactions via wire communications.

## VII.     PROBABLE CAUSE

29)     In September 2020, KCSO questioned CS-1 regarding CS-1's knowledge of cocaine distribution in Knoxville, Tennessee. CS-1 stated a local supplier described as a Hispanic male was supplying and distributing cocaine through "Lil Man," identified as CAMPBELL. CS-1 explained CAMPBELL would set up drug transactions at his residence located at 2709 Tecoma

Drive, Knoxville, Tennessee, and the Hispanic male (later identified as MARCANO ROMAN[3]) would deliver and conduct the drug transaction. CS-1 provided telephone number (865) 722-2019 (**Target Telephone 1**) as the telephone number used by CAMPBELL.

### *October 1, 2020, Controlled Purchase of 2 ounces Cocaine by KCSO*

30)     Prior to October, 1, 2020, officers with the KCSO contacted and instructed CS-1 to coordinate a purchase of two ounces of cocaine with CAMPBELL for October 1, 2020. At the direction of officers, CS-1 contacted CAMPBELL, at **Target Telephone 1**, and coordinated the controlled purchase. Although KCSO did not record any telephone communications between CS-1 and CAMPBELL prior to controlled purchase, agents reviewed toll records obtained from Verizon Wireless for **Target Telephone 1**, used by CAMPBELL. According to those records, on September 30, 2020, at 4:24 p.m., CS-1 called **Target Telephone 1**. The duration of the call was only 00:02. No other communications occurred on **Target Telephone 1** until 5:20 p.m., when **Target Telephone 1** called 865-235-5008, used by MARCANO ROMAN, with a duration of 00:48. At 5:28 p.m., **Target Telephone 1** called CS-1, with a duration of 00:52. At 5:30 p.m., **Target Telephone 1** called MARCANO ROMAN at 865-235-5008, with a duration of 00:22. During the span of these above listed calls, **Target Telephone 1** had no additional communications. Based on my training and experience, as well as knowledge of this investigation, I believe the purpose of CS-1 contacting CAMPBELL at **Target Telephone 1** was to negotiate the purchase of two ounces of cocaine as CS-1 was directed by KCSO officers. Furthermore, I believed the purpose of the communications between **Target Telephone 1** and 865-235-5008 was for CAMPBELL to further coordinate the delivery of cocaine from

---

[3] MARCANO ROMAN was identified during this investigation through surveillance, vehicle registrations, parcels through U.S. Postal Service, and utility records. CS-1 identified a photo of MARCANO ROMAN as the Hispanic male that supplied CS-1 with cocaine.

Case 3:21-mc-05001-TAV    Document 2    Filed 03/24/21    Page 15 of 56    PageID #: 30

MARCANO ROMAN.[4]

31)     On October 1, 2020, officers with the KCSO met with CS-1 for the purpose of conducting a controlled purchase of two ounces of cocaine from CAMPBELL and MARCANO ROMAN at 2709 Tecoma Drive, Knoxville, Tennessee (hereinafter referred to as "CAMPBELL's Residence").  Records from Verizon Wireless indicate that **Target Telephone 1** called CS-1 on October 1, 2020 at approximately 5:14 p.m., with a duration of 00:11.  Prior to the controlled purchase taking place, officers searched CS-1 and CS-1's vehicle for narcotics, paraphernalia, and money, with negative results.  Officers provided CS-1 with $3,600 recorded Knox County drug buy funds, and a concealed audio recording device for the controlled purchase.

32)     Officers conducted surveillance of CS-1 during the controlled purchase.  At approximately 5:24 p.m. CS-1 departed the predetermined meeting location.  At approximately 5:29 p.m. CS-1 arrived at CAMPBELL's residence.

33)     At approximately 5:45 p.m., officers observed a Hispanic male, matching the description CS-1 provided, arrive at CAMPBELL's residence.  The Hispanic male was driving a black Ford Escape with Tennessee license plate 8T06R5, a vehicle registered to Eliana Martinez at 3305 Tazewell Pike, Apartment 23, Knoxville, Tennessee.

34)     At approximately 5:47 p.m., CS-1 departed CAMPBELL's residence and returned to a predetermined location to meet with officers.  Upon meeting back with officers, CS-1 turned over the audio recording device and approximately two ounces of a white powdery substance

---

[4] The listed communications do not include all communications between **Target Telephone 1** and CS-1 or **Target Telephone 1** and MARCANO ROMAN.  However the listed communications illustrate that CAMPBELL went back and forth between CS-1 (drug purchaser) and MARCANO ROMAN.

believed to be cocaine[5]. CS-1 and CS-1's vehicle were again searched for narcotics, paraphernalia, and money, with negative results.

35) CS-1 provided the following details as to how the controlled purchase occurred, as corroborated by the audio recording. CS-1 stated it was not uncommon for other drug customers to be at CAMPBELL's residence waiting for MARCANO ROMAN to arrive. CS-1 did not identify any of the other individuals. CS-1 said it appeared that MARCANO ROMAN was alone. CS-1 has told agents that MARCANO ROMAN sometimes travels with another unidentified male. CS-1 said once MARCANO ROMAN arrived at CAMPBELL's residence everyone went inside to the kitchen where CS-1 handed over the money to be counted by MARCANO ROMAN. CS-1 explained once the money was accounted for, MARCANO ROMAN handed CS-1 the drugs and CS-1 departed.

36) In the following days, KCSO identified the Hispanic male as MARCANO ROMAN.

### *October 8, 2020, Controlled Purchase of 2 ounces Cocaine by KCSO*

37) On October 8, 2020, officers with KCSO met with CS-1 for the purpose of conducting a controlled purchase of two ounces of cocaine from CAMPBELL and MARCANO ROMAN at CAMPBELL's residence. Although KCSO did not record any telephone communications between CS-1 and CAMPBELL prior to controlled purchase, agents reviewed toll records obtained from Verizon Wireless for **Target Telephone 1**, used by CAMPBELL. According to those records, **Target Telephone 1** received a call from 865-235-5008, used by MARCANO ROMAN , at 4:37 p.m., with a duration of 00:08. Immediately following the communication with MARCANO ROMAN, **Target Telephone 1** called CS-1. Again after the call to CS-1,

---

[5] The suspected cocaine has been sent to the Tennessee Bureau of Investigation Laboratory. At this time agents have not received the Laboratory analysis.

**Target Telephone 1** called 865-235-5008 at 4:43 p.m. Based on my training and experience, as well as knowledge of this investigation, I believed the communications between CS-1 and **Target Telephone 1** and MARCANO ROMAN and **Target Telephone 1** were used to coordinate the purchase of cocaine that followed these communications.

38)     Prior to the controlled purchase taking place, officers searched CS-1 and CS-1's vehicle for narcotics, paraphernalia, and money, with negative results. Officers provided CS-1 with $3,600 recorded Knox County drug buy funds, and a concealed audio recording device for the controlled purchase.

39)     At approximately 5:17 p.m., CS-1 departed the meeting location and drove to CAMPBELL's residence. At approximately 5:23 p.m., CS-1 arrived at CAMPBELL's residence. Based on the audio from the concealed recording device, the following conversation took place during the controlled purchase[6]:

CS-1:       Hey, how long this nigga gonna take, she definitely didn't wanna watch the kids. I said I would be right back.

CAMPBELL: [Side Conversation with MARCANO ROMAN[7]] Yo about how long? [Pause] Alright.

CS-1:       You better get your hands off that shit.

CAMPBELL: Oh, she's got a [Unintelligible]

CS-1:       Yeah.

CAMPBELL: [Laughes] He said he's hurrying.

[Unintelligible]

---

[6] The transcripts of calls and conversations included in this Affidavit are based on draft transcripts which were prepared by a DEA agent. These draft transcriptions may vary from finalized transcripts in the future. The calls and conversations are not quoted in their entirety. Instead, only the most relevant parts of the calls are included in the Affidavit.

[7] Based on records from Verizon Wireless, CAMPBELL, using **Target Telephone 1** made a call to MARCANO ROMAN at telephone number (865) 235-5008 at 5:27 p.m. with a duration of approximately 00:10, corroborating and coinciding with the audio from the controlled purchase.

CS-1:            Just two.

CAMPBELL: Just two not three?

CS-1:            Yeah.

----

CS-1:            Yeah why you charging me 18 though? [Pause] Oh you making a hundred off each one.

[Dogs start barking]

[Unintelligible conversation – dogs barking in background]

CS-1:            Let me grab two off you.

Male voice:    You bought two?

CS-1:            You ain't got none split up?

Male Voice:    Yep.

CS-1:            You got some of that cool shit.

Based on the audio recording, CS-1 and CAMPBELL had a conversation prior to MARCANO ROMAN arriving. Based on my training, experience, conversations with CS-1, and conversations with officers from KCSO, I believe CS-1 met with CAMPBELL for the purpose of purchasing $3,600 worth of cocaine. CS-1 explained that CAMPBELL brokers the distribution of cocaine for MARCANO ROMAN and MARCANO ROMAN delivers the cocaine to CS-1. When CS-1 said, "Just two," I believe CS-1 was telling CAMPBELL that CS-1 only wanted two ounces of cocaine. When CAMPBELL responded with, "Just two not three," I believe he was asking if CS-1 was sure CS-1 did not want three ounces of cocaine. Later in the conversation when CS-1 stated, "Yeah why you charging me 18 though? [Pause] Oh you making a hundred off each one," I believe CS-1 was asking CAMPBELL why CAMPBELL was charging $1,800.00 per ounce, then although CAMPBELL never responded, CS-1 acknowledged that CAMPBELL was making $100 on each ounce that CS-1 purchased from MARCANO ROMAN.

40) While officers were surveilling CS-1's travels to CAMPBELL's residence, other officers conducted surveillances on MARCANO ROMAN. Officers observed MARCANO ROMAN leave his residence located at 4831 Summit Circle, Apartment 196, Knoxville, Tennessee, and get into a white Honda Civic hatchback bearing Tennessee license plate 0L86X0, a vehicle registered to MARCANO ROMAN. Officers overserved MARCANO ROMAN travel directly from his residence to CAMPBELL's residence. MARCANO ROMAN arrived a short time after CS-1 had arrived. Officers observed MARCANO ROMAN depart the residence a short time after CS-1 departed. Based on my training and experience, as well as conversations with CS-1 and conversations with officers from KCSO, I believe MARCANO ROMAN travelled from his residence at 4831 Summit Circle, Apartment 196, Knoxville, Tennessee, to sell cocaine to CS-1 at CAMPBELL's residence.

41) Upon meeting back with officers, CS-1 turned over the audio recording device and approximately two ounces of a white powdery substance believed to be cocaine [8]. CS-1 and CS-1's vehicle were again searched for narcotics, paraphernalia, and money, with negative results.

### *October 21, 2020, Controlled Purchase of 2 ounces Cocaine by KCSO*

42) On October 21, 2020, officers with KCSO met with CS-1 for the purpose of conducting a controlled purchase of two ounces of cocaine from CAMPBELL and MARCANO ROMAN at CAMPBELL's residence. Although KCSO did not record any telephone communications between CS-1 and CAMPBELL prior to controlled purchase, agents reviewed toll records obtained from Verizon Wireless for **Target Telephone 1**, used by CAMPBELL. According to those records, **Target Telephone 1** called CS-1 at 5:06 p.m., with a duration of 00:25.

---

[8] The suspected cocaine has been sent to the Tennessee Bureau of Investigation Laboratory. At this time agents have not received the Laboratory analysis.

Immediately following that call, **Target Telephone 1** made five outgoing calls to MARCANO ROMAN at 865-235-5008, all with a duration of 00:03 or less. At 5:11 p.m., **Target Telephone 1** again called CS-1. At 5:30 p.m., **Target Telephone 1** received a call from MARCANO ROMAN, using 865-235-5008 with a duration of 00:46. At 5:41 p.m., **Target Telephone 1** called MARCANO ROMAN, at 865-235-5008, with a duration of 00:03. At 5:43 p.m., **Target Telephone 1** received a call from MARCANO ROMAN, with a duration of 00:32. At 5:44 p.m., Target Telephone 1 called CS-1, with a duration of 00:11. Based on my training and experience, as well as knowledge of this investigation, I believed the communications between CS-1 and **Target Telephone 1** and MARCANO ROMAN and **Target Telephone 1** were used to coordinate the purchase of cocaine that followed these communications.

43)     Prior to the controlled purchase taking place, officers searched CS-1 and CS-1's vehicle for narcotics, paraphernalia, and money, with negative results. Officers provided CS-1 with $3,600 recorded Knox County drug buy funds, and a concealed audio recording device for the controlled purchase. At approximately 5:58 p.m., CS-1 departed the meeting location and drove to CAMPBELL's residence. At approximately 6:05 p.m., CS-1 arrived at CAMPBELL's residence. Based on the audio from the concealed recording device, the following conversation took place during the controlled purchase:

> CAMPBELL: Look here check this out [Unintelligible] like he said for you, the mother fucker got the whole key. He charges 16 a piece but this one I'm telling you, like dude, like you ready today, you got some money today right. My other nigga may not have no money… so I can't get it all, all at one time. But I know one thing, he told me again, he like maybe another week that my dad could drop the price again.
>
> --
>
> CAMPBELL: But listen, then hey, when I been calling him, like I be like I get two [Unintelligible]. And he be like, 'that's all, where the rest of the…" I be like shit they…

CS-1:           Yeah you gotta tell him [Unintelligible].

CAMPBELL:  Yeah, but then I'm telling him like shit they done found it somewhere
                cheap.

CS-1:           Yeah.

CAMPBELL:  So that's why he's really trying to drop the prices.

CS-1:           It is high for it to be so [Unintelligible]

CAMPBELL:  Well shit, I'm gonna tell you [Unintelligible].  I mean it's better than
                seventeen or seventeen five.  [Unintelligible]

CS-1:           Shit I pay… some of them come out eight, nine, even two thousands
                [Unintelligible]

CAMPBELL:  What? Out here in the city?

CS-1:           Yeah.

--

Based on the audio recording, CS-1 and CAMPBELL had a conversation prior to MARCANO

ROMAN arriving.  Based on my training, experience, conversations with CS-1 and

conversations with officers from KCSO, I believe CS-1 met with CAMPBELL and MARCANO

ROMAN for the purpose of purchasing $3600 worth of cocaine.  CS-1 explained that

CAMPBELL brokers the distribution of cocaine for MARCANO ROMAN and MARCANO

ROMAN delivers the cocaine to CS-1.  When CAMPBELL stated, "the mother fucker got the

whole key," I believe he was referring to a kilogram of cocaine.

44)     While officers were surveilling CS-1's travels to CAMPBELL's residence, other officers

conducted surveillances on MARCANO ROMAN.  At approximately 6:02 p.m., officers

observed MARCANO ROMAN leave his residence located at 4831 Summit Circle, Apartment

196, Knoxville, Tennessee, and get into a red BMW sedan bearing Tennessee license plate

2W29P7, a vehicle registered to MARCANO ROMAN.  Officers observed an unknown black

male in the passenger seat of MARCANO ROMAN's vehicle.  At approximately 6:22 p.m.,

officers overserved MARCANO ROMAN arrive at CAMPBELL's residence. At approximately 6:26 p.m., CS-1 departed CAMPBELL's residence. Officers observed MARCANO ROMAN depart CAMPBELL's residence at approximately 6:41 p.m. and travel back to his residence at 4831 Summit Circle, Apartment 196, Knoxville, Tennessee. Based on my training and experience, as well as conversations with CS-1 and conversations with officers from KCSO, I believe MARCANO ROMAN travelled from his residence at 4831 Summit Circle, Apartment 196, Knoxville, Tennessee, to sell cocaine to CS-1 at CAMPBELL's residence.

45)     Upon meeting back with officers, CS-1 turned over the audio recording device and approximately two ounces of a white powdery substance believed to be cocaine [9]. CS-1 and CS-1's vehicle was again searched for narcotics, paraphernalia, and money, with negative results. CS-1 told officers the money was given to MARCANO ROMAN in exchange for the two ounces of cocaine.

### *November 30, 2020, Controlled Purchase of 2 ounces Cocaine by KCSO and DEA*

46)     On November 30, 2020, officers with KCSO, DEA, and USPIS met with CS-1 for the purpose of conducting a controlled purchase of two ounces of cocaine from CAMPBELL and MARCANO ROMAN at CAMPBELL's residence. Prior to the controlled purchase, officers instructed CS-1 to call CAMPBELL and set up the controlled purchase. At approximately 2:45 p.m., agents observed as CS-1 called CAMPBELL at **Target Telephone 1**[10]. During the call, the following conversation took place:

CAMPBELL: Hello

---

[9] The suspected cocaine has been sent to the Tennessee Bureau of Investigation Laboratory. At this time agents have not received the Laboratory analysis.
[10] Toll records from Verizon Wireless show that, there was an incoming call to **Target Telephone 1** from CS-1's telephone number at 2:48 p.m. This call was recorded and a draft transcript was completed by agents based on a review of that recording.

CS-1:          What's up boy?

CAMPBELL: What's up?

CS-1:          [Unintelligible] on a [Unintelligible] call [Unintelligible] call.

CAMPBELL: Oh okay, okay, okay.  Uh yeah, yeah he said later on. That's what's up.

CS-1:          Okay, well just call me when you ready.

CAMPBELL: Alright. On this number?

CS-1:          Uh yeah you can.

CAMPBELL: Alright.

CS-1:          Uh what you uh, 2?

CAMPBELL: Yeah, is what you said wasn't it?

CS-1:           Alright.

Based on my training, experience, and knowledge of this investigation, I believe the purpose of the above call was to confirm the delivery of two ounces of cocaine.  When CAMPBELL told CS-1, "yeah he said later on," I believe CAMPBEL was referring to MARCANO ROMAN, meaning that MARCANO ROMAN would be able to deliver the cocaine later on that day. When CS-1 said, "Uh what you uh, 2," I believe CS-1 was confirming that MARCANO ROMAN would bring two ounces of cocaine for CS-1.  I believe CAMPBELL confirmed that MARCANO ROMAN would bring two ounces of cocaine when he said, "Yeah, is what you said wasn't it."

47)    At approximately 5:00 p.m., officers and agents met with CS-1 for the purpose of conducting the controlled purchase.  As officers were waiting for CS-1 to receive a call from CAMPBELL to let CS-1 know CAMPBELL was ready, officers observed a dark colored SUV arrive at CAMPBELL's residence.  As soon as the SUV arrived, CS-1 received a phone call from CAMPBELL, using **Target Telephone 1**.  CS-1 informed officers that CAMPBELL called

and told CS-1 that MARCANO ROMAN had arrived[11]. Prior to the controlled purchase taking place, officers searched CS-1 and CS-1's vehicle for narcotics, paraphernalia, and money, with negative results. Officers provided CS-1 with $3,600 recorded Knox County drug buy funds, and a concealed audio recording device for the controlled purchase. At approximately 6:02 p.m., CS-1 departed the meeting location and drove to CAMPBELL's residence. At approximately 6:10 p.m., CS-1 arrived at CAMPBELL's residence. At approximately 6:18 p.m., CS-1 departed the residence and returned to a predetermined location to meet with officers. Shortly after CS-1 departed, surveillance observed the dark colored SUV depart and observed that it was bearing Tennessee license plate 8T06R5, a vehicle registered to Eliana Martinez, at 3305 Tazewell Pike, Apartment 23, Knoxville, Tennessee.

48) Upon meeting back with officers, CS-1 turned over the audio recording device and approximately two ounces of a white powdery substance believed to be cocaine [12]. CS-1 and CS-1's vehicle was again searched for narcotics, paraphernalia, and money, with negative results. CS-1 told agents CS-1 observed a female passenger sitting inside the dark SUV driven by MARCANO ROMAN.

### *December 16, 2020, Controlled Purchase of 2 ounces Cocaine by KCSO and DEA*

49) On December 14, 2020, at approximately 1:20 p.m., officers with KCSO instructed CS-1 to place a recorded phone call to CAMPBELL at **Target Telephone 1**, for the purpose of negotiating a controlled purchase of cocaine[13]. During the recorded call the following

---

[11] This call was not recorded as it was an incoming call from **Target Telephone 1** and CS-1 had not been provided a concealed recorder at this time. The call was verified through records received from Verizon Wireless. The call occurred at 5:55 p.m. and had a duration of 00:27.
[12] The suspected cocaine has been sent to the Tennessee Bureau of Investigation Laboratory. At this time agents have not received the Laboratory analysis.
[13] Officers listened to the call via a consensual three-way call. The call to **Target Telephone 1** was confirmed via records from Verizon Wireless. The call occurred at 1:22 p.m. and had a duration of 00:59 minutes.

Case 3:21-mc-05001-TAV   Document 2   Filed 03/24/21   Page 25 of 56   PageID #: 40

conversation took place:

CAMPBELL: Hello

CS-1: What's good [Unintelligible]?

CAMPBELL: Huh?

CS-1: I said what's good with you?

CAMPBELL: Shit what's up with it?

CS-1: Man shit. Was gonna uh probably need you in a day or two. Just making sure shit still good.

CAMPBELL: Yeah.

CS-1: Alright. I was making sure wasn't that stinky feet. (laughs)

CAMPBELL: Shit I probably end up diving before you do anyway. Probably tomorrow or something so I could let you know.

CS-1: Okay, okay.

CAMPBELL: Yeah I don't know for sure though.

CS-1: Alright just hit me up.

CAMPBELL: Alright my [Unintelligible], alright.

CS-1: Alright.

Based on my training and experience, as well as knowledge of this investigation, I believe the purpose of the above phone call was to arrange a controlled purchase of cocaine from CAMPBELL and MARCANO ROMAN. When CS-1 stated, "Was gonna uh probably need you in a day or two. Just making sure shit still good," I believe CS-1 was using coded language to tell CAMPBELL that CS-1 was going to need a re-up of cocaine in the next day or so. When CAMPBELL responded, "Yeah," I believe CAMPBELL was acknowledging that he would be ready for CS-1. When CS-1 stated, "I was making sure wasn't that stinky feet," I believe CS-1 was making sure the availability of quality cocaine were still good. When CAMPBELL said,

"Shit I probably end up diving before you do anyway, I believe CAMPBELL was telling CS-1 that he would probably need a re-up of cocaine before CS-1 did.

50)     On the following day, December 15, 2020, officers with KCSO instructed CS-1 to place another recorded phone call to CAMPBELL at **Target Telephone 1**[14]. The purpose of the call was to follow-up from the call above and arrange for a controlled purchase of cocaine.  During the recorded call the following conversation took place:

>    CAMPBELL: Hello.
>
>    CS-1:          What's good boy?
>
>    CAMPBELL: What's up with you?
>
>    CS-1:          [Unintelligible] shit, about to get off.
>
>    CAMPBELL: Oh okay, yeah you did tell me you were working.  Uh, I'll make that phone call.
>
>    CS-1:          Yeah I'm off tomorrow though.
>
>    CAMPBELL: Okay want me to just set it up for tomorrow?  Cause it's, it's pretty straight.  Cause I had uh, grab something.
>
>    CS-1:          Okay yeah uh, you said tomorrow?
>
>    CAMPBELL: Yeah if you, if it's better for you.
>
>    CS-1:          Yeah, yeah, uh just two of em.
>
>    CAMPBELL: Alright.
>
>    CS-1:          Alright.
>
>    CAMPBELL: [Unintelligible]

Based on my training, experience, and knowledge of this investigation, I believe the purpose of the call was to arrange a controlled purchase of cocaine from CAMPBELL and MARCANO

---

[14] Officers listened to the call via a consensual three-way call.  The call to **Target Telephone 1** was confirmed via records from Verizon Wireless.  The call occurred at 6: 13 p.m. and had a duration of 59 seconds.

ROMAN. When CAMPBELL said, "Uh, I'll make that phone call," I believe he thought CS-1 was ready to purchase cocaine and CAMPBELL was telling CS-1 that he (CAMPBELL) would call MARCANO ROMAN to set it up. When CS-1 responded, "Yeah I'm off tomorrow though," I believe CS-1 was explaining to CAMPBELL that the following day would work better[15]. When CAMPBELL responded, "Okay want me to just set it up for tomorrow," I believe CAMPBELL was asking if CS-1 wanted CAMPBELL to make arrangements with MARCANO ROMAN to bring cocaine the following day. When CS-1 said, "yeah, uh just two of em,' I believe CS-1 was letting CAMPBELL know CS-1 only needed two ounces of cocaine. CAMPBELL then acknowledged with, "Alright." Toll records of **Target Telephone 1** indicate that approximately two hours after speaking to CS-1, at 8:39 p.m., **Target Telephone 1** made an outgoing call to 865-235-5008, used by MARCANO ROMAN.

51)     On December 16, 2020, at approximately 4:15 p.m., officers with the KCSO, DEA, and USPIS met with CS-1 for the purpose of conducting a controlled purchase of two ounces of cocaine from CAMPBELL and MARCANO ROMAN at CAMPBELL's residence. The CS told agents that CAMPBELL, using **Target Telephone 1**, had contacted CS-1 earlier in the afternoon and indicated that MARCANO ROMAN would be at CAMPBELL's residence early[16]. At approximately 4:35 p.m., CS-1 received a telephone call from CAMPBELL, using **Target Telephone 1**. CS-1 told agent that CAMPBELL directed CS-1 to come to his (CAMPBELL's) residence. Based on records from Verizon Wireless, immediately prior to calling CS-1, **Target Telephone 1** received a call from 865-235-5008, used by MARCANO ROMAN. Based on my

---

[15] Officers and Agents had already planned to conduct the controlled purchase on December 16, 2020 (the following day). The purpose of the call was to make sure CAMPBELL and ROMAN were ready and CS-1 would not otherwise be delayed on the following day.
[16] The previous controlled purchases had occurred after 5:00 p.m. This telephone call was not recorded as CS-1 was not in the presence of law enforcement and had not been provided a recording device at the time of the call. Based on records from Verizon Wireless, CS-1 received a call from **Target Telephone 1** at 3:30 p.m., with a duration of 00:34. Furthermore prior to calling CS-1, at 3:10 p.m., **Target Telephone 1** received an incoming call from 865-235-5008, used by MARCANO ROMAN.

Case 3:21-mc-05001-TAV   Document 2   Filed 03/24/21   Page 28 of 56   PageID #: 43

training and experience, as well as knowledge of this investigation, I believe CAMPBELL called CS-1 after coordinating with MARCANO ROMAN.

52) Prior to the controlled purchase taking place, agents searched CS-1 and CS-1's vehicle for narcotics, paraphernalia, and money, with negative results. Agents provided CS-1 with $3,600 recorded DEA drug buy funds, and a concealed audio recording device for the controlled purchase.

53) At approximately 4:42 p.m., CS-1 departed the predetermined meeting location and traveled toward CAMPBELL's residence. While CS-1 was traveling, at approximately 4:48 p.m., surveillance near CAMPBELL's residence observed a red BMW matching the description of the vehicle driven by MARCANO ROMAN, pulled up to CAMPBELL's residence. At approximately 4:56 p.m., CS-1 arrived at CAMPBELL's residence. Based on the audio from the concealed recording device, during the controlled purchase, CAMPBELL told CS-1, "Hey, he said if you want to get five, they go for sixteen a piece." Based on my training, experience, and conversations with CS-1, I believe CAMPBELL meant if CS-1 would purchase five ounces of cocaine the price would drop to $1,600 per ounce.

54) At approximately 5:00 p.m., CS-1 departed CAMPBELL's residence. Shortly afterward, at approximately 5:02 p.m., surveillance observed MARCANO ROMAN's red BMW depart CAMPBELL's residence. Upon meeting back with agents, CS-1 turned over the audio recording device and approximately two ounces of a white powdery substance believed to be cocaine. CS-1 and CS-1's vehicle was again searched for narcotics, paraphernalia, and money, with negative results. CS-1 told agents that when CS-1 arrived CS-1 went into the residence and to the right into the kitchen. CS-1 stated both CAMPBELL and MARCANO ROMAN were in the kitchen and the suspected cocaine was sitting on the kitchen counter. CS-1 said CS-1 handed the $3,600

OAF directly to MARCANO ROMAN and then took the suspected cocaine. CS-1 briefly spoke with CAMPBELL and MARCANO ROMAN at which time CS-1 was told that if CS-1 could purchase larger quantities, such as 5 ounces or more, then MARCANO ROMAN could probably lower the price per ounce to around $1,650 or $1,700.

## VIII. ANALYSIS OF PHONE TOLL/PEN REGISTER INFORMATION

55) On November 23, 2020, Verizon Wireless sent a subpoena compliance notice to DEA, stating **Target Telephone 1** was currently active. Based on records from Verizon Wireless, **Target Telephone 1** is a pre-pay account and has been active since September 19, 2020.

56) On December 3, 2020, United States Magistrate Judge Debra C. Poplin, Eastern District of Tennessee, issued a court order authorizing the installation and use of a pen register for **Target Telephone 1**. Collection of call and text information began on December 9, 2020. Toll records have been compiled from both the pen register and from records requested from Verizon Wireless.

57) Based on this investigation, I believe that **Target Telephone 1** has been used by CAMPBELL since at least September 19, 2020, and that CAMPBELL continues to use **Target Telephone 1**[17]. The telephone records show the number of calls to and from **Target Telephone 1**, and the duration of the time the target phone is "off the hook" or engaged in the call. The following telephone toll/pen register record analysis is provided to show a telephonic connection between the telephone known to be utilized by CAMPBELL for drug distribution and several identified drug trafficking associates.

58) The tolls for **Target Telephone 1** showed that, between December 17, 2020, and January

---

[17] Agents know that **Target Telephone 1** pertains to CAMPBELL for the following reason: This number was provided as CAMPBELL's from CS-1 and further used during the controlled purchases completed by CS-1.

Case 3:21-mc-05001-TAV   Document 2   Filed 03/24/21   Page 30 of 56   PageID #: 45

18, 2021, **Target Telephone 1** made or received approximately 1,012 telephone calls, and sent or received approximately 150 text messages. Based upon my training and experience, drug traffickers make numerous short duration telephone calls; of the total 1,012 voice communications, 987 of those were less than 2 minutes in duration. The following is an analysis of numbers in contact with **Target Telephone 1** between December 17, 2020 and January 18, 2021. The date range for this analysis indicated the date of the first and last exchange between that telephone number and **Target Telephone 1**.

| Telephone Number | Subscriber Information | Calls to/Calls from TT1 |
|---|---|---|
| A. 865-235-5008 | MARCOS MARCANO<br>4831 Summit Circle<br>Knoxville, Tennessee | 62 Total Contacts Between December 21, 2020 and January 15, 2021. 62 calls and 0 Text/SMS |

Between December 17, 2020, and January 18, 2021, **Target Telephone 1** made or received approximately 62 calls with phone number 865-235-5008, with the last call occurring on January 15, 2021. Between December 17, 2020, and January 18, 2021, **Target Telephone 1** exchanged no text messages with phone number 865-235-5008. Phone number 865-235-5008 is believed to be used by MARCANO ROMAN. The phone is subscribed to MARCOS MARCANO an alias and partial name of MARCOS AUGUSTO MARCANO ROMAN. Additionally, the phone has been listed on several shipping labels where MARCANO ROMAN shipped packages through FedEx. Based on records from RIA Financial, MARCANO ROMAN also listed the phone as his contact number on multiple money wire transfers to Puerto Rico and Florida.

| Telephone Number | Subscriber Information | Calls to/Calls from TT1 |
|---|---|---|
| B. 865-415-9094 | RICHARD LANXTER<br>1948 Natchez Ave, Apt 808<br>Knoxville, TN | 242 Total Contacts Between December 17, 2020 and January 18, 2021. 241 Calls and 1 Text/SMS |

Between December 17, 2020, and January 18, 2021, **Target Telephone 1** made or received approximately 241 calls with phone number 865-415-9094, with the last call occurring on January 18, 2021; only one text message has occurred during this time period. Based on records from T-Mobile, telephone 865-415-9094 is subscribed to RICHARD LANXTER. This investigation has also identified telephone number 615-231-0674, which according to Verizon Wireless, is also subscribed to LANXTER; a telephone also in frequent communication with CAMPBELL. Records provide that this secondary number for LANXTER was in

communication with CAMPBELL 20 times between December 18, 2020 and December 21, 2020. LANXTER has prior convictions for possession of Schedule II, possession of crack cocaine, possession of drug paraphernalia, and possession of cocaine with intent to deliver and was sentenced to 164 months – all occurring in Knoxville, TN. Additionally, LANXTER has a history of probation violations and evading arrest.

| Telephone Number | Subscriber Information | Calls to/Calls from TT1 |
| --- | --- | --- |
| C. 865-232-6111 | No subscriber information available; pre-paid account. | 135 Total Contacts Between December 17, 2020 and January 18, 2021. 131 Calls and 0 Text/SMS |

Between December 17, 2020, and January 18, 2021, **Target Telephone 1** made or received approximately 135 calls with phone number 865-232-6111, with the last call occurring on January 17, 2021. Between December 17, 2020, and January 18, 2021, **Target Telephone 1** exchanged no text messages with phone number 865-232-6111, Phone number 865-232-6111 is believed to be used by TREAVOR WARREN. WARREN has prior convictions for simple possession, possession of Schedule IV for resale, and felony possession of cocaine with intent to deliver and was sentenced to 8 years, all in Knoxville, TN. Additionally, WARREN has a history of transporting firearms by a felon (Wythe Co., VA) and criminal possession of a weapon and criminal possession of controlled substance (NYPD). Based on a query of Knoxville Police Department (KPD) reporting system, telephone number 865-232-6111 has been linked to WARREN, and is frequent communication with CAMPBELL. Based on a query of open-source information, this telephone number is linked to Yolonda WARREN. Based on records from Verizon Wireless, (865) 232-6111 is subscribed to a pre-paid phone account with no subscriber information available.

59)    I know through my training and experience that individuals involved in drug trafficking frequently use more than one phone and/or phone number(s) as well as use phones and/or phone numbers that are subscribed to by other individuals or aliases. In addition, I know that individuals involved in drug trafficking frequently "drop," or use for a short period of time, a phone in order to thwart law enforcement efforts. I believe that CAMPBELL has used **Target Telephone 1**, as his primary telephone number to further his drug trafficking activities.

## IX.    PROBABLE CAUSE SUMMARY

60)    Based on the information set forth above, I believe CAMPBELL, a.k.a. "Lil Man", MARCANO ROMAN, and others are involved in the distribution of cocaine in the Eastern

District of Tennessee, and elsewhere. I further believe CAMPBELL is using **Target Telephone 1** to facilitate his drug trafficking activities.

61) In sum, I believe that **Target Telephone 1** is being used and will continue to be used to facilitate this organization's drug trafficking and that the interception of wire communications occurring over **Target Telephone 1** will assist in further identifying the members of the DTO and its methods of operation, money laundering activities, associates, and source(s) of supply.

62) This investigation has shown that there is probable cause to believe that the target subjects have conducted, are conducting, and will continue to conduct those criminal activities described herein, by the use of **Target Telephone 1** identified above. The investigation has shown that CAMPBELL uses **Target Telephone 1** to coordinate the distribution of cocaine from MARCANO ROMAN to drug customers including CS-1. I believe drug customers contact CAMPBELL at **Target Telephone 1** to place drug orders and in-turn CAMPBELL uses **Target Telephone 1** to coordinate delivery from MARCANO ROMAN. I further believe, members of the CAMPBELL organization are committing, and will continue to commit violations described herein.

63) Based on the investigation, including controlled drug purchases, criminal histories and information gained from CS-1, co-conspirators, and law enforcement intelligence, I believe that the target interceptees have been and are currently engaged in illegal drug trafficking activities. Agents know that **Target Telephone 1** is being used in furtherance of the drug trafficking conspiracy. Agents can infer that communications between the target interceptees and the target telephone are illicit in nature and drug related.

64) At this time agents do not know if Campbell has other drug suppliers and, more importantly, who supplies MARCANO ROMAN. Furthermore agents do not know who else

MARCANO ROMAN supplies besides CAMPBELL.

65)     The investigation has further shown that there is probable cause to believe that the target interceptees, have used, are using, and will continue to use **Target Telephone 1**, identified above, to facilitate the commission of the violations enumerated herein, and that the evidence will include the identities and roles of participants in an illegal controlled substance distribution and trafficking organization; the manner in which this illegal controlled substance distribution organization operates; the identification of the illegal conduct; the identification of the nature and methods of the managing and financing of the controlled substance distribution organization; the locations of any controlled substance stash and controlled substance warehouses; the suppliers of the controlled substance; the identification and location of future controlled substance transactions; the deification of controlled substance distribution methods; the identification and location of evidence of controlled substance transactions, financial records and other records reflecting the occurrence of controlled substance transactions, and monies being used to finance and conduct the controlled substance transactions; and the identification of other individuals not yet identified who are participating in, directing, or deriving financial profit and benefit from the illegal controlled substance distribution business; and the identity of which telephone, telephones, and/or paging device or devices, if any, is or are being used by the targets of the investigation.

## X.     NEED FOR WIRE INTERCEPTION

66)     The interception of the requested wire communications occurring over **Target Telephone 1** is necessary because normal investigative procedures have been tried and have failed, appear reasonably unlikely to succeed if tried, or are too dangerous.  These investigative procedures are detailed below.  Traditional methods of investigation will not entirely accomplish

the stated goal of the investigation, which include, but are not limited to, discovering: (a) the identities of all of the individual involved in this drug trafficking and money laundering organization; (b) the exact roles of these various individuals; (c) the full identification and methods of operation of the persons providing narcotics to this organization; (d) the locations where members of the organization store their narcotics and drug proceeds; (e) the methods by which the members of this organization transport and distribute their narcotics; and, (f) the methods by which the organization's members launder, distribute, or conceal the assets acquired as a result of their illegal activities.

67)     It has been my experience that drug traffickers are careful about introducing outsiders to other members of the organization.  They are also careful to limit and compartmentalize the knowledge that each member has about the organization.  This prevents members, especially new members, from having enough information to do substantial harm to the organization in the event that they decide to cooperate with law enforcement.

68)     Additionally, it is common for drug traffickers to "drop" or change, telephones for the purpose of evading electronic surveillance and to thwart law enforcement's efforts to intercept their communications.  Accordingly, it takes time and resources to identify the new telephones that the drug traffickers are using.

69)     The following is a list of the investigation techniques that have been used to date, or that I have considered using in this investigation, along with an explanation as to why these techniques have not or are not likely to succeed in identifying the full nature and scope of this conspiracy:

### A.     PHYSICAL and ELECTRONIC SURVEILLANCE

70)     Physical surveillance is an investigative technique that is used to confirm meetings

between alleged conspirators, but often leaves law enforcement to speculate as to the purpose of the meetings. Although surveillance may confirm that meetings occurred, it does not provide the content of the conversation occurring at the meetings or the other activities occurring at the meetings. However when physical surveillance when used in conjunction with the interception of communications, the meetings have additional significance because agents have access to the communication among the participants.

71)     In light of the limitations, physical surveillance, in and of itself, rarely succeeds in gathering sufficient evidence of the criminal activities under investigation. I do not believe that extensive surveillance, even when combined with other normal investigative procedures, would lead to complete identification of all members of the conspiracy. Surveillance is of limited value, particularly in controlled substance investigations where transactions often occur out of public view and at irregular times. Additionally, based upon my experience, extensive surveillance conducted in controlled substance investigations is often discovered by the subjects of the investigation, who are themselves conducting surveillance or counter-surveillance for law enforcement, competing drug dealers, and robbers. The discovery of surveillance by the subjects forces the immediate and abrupt termination of the surveillance and jeopardizes the entire investigation. Due to the nature of drug organizations, many drug traffickers carry weapons to protect their drugs and profits, which may make surveillance or other investigative techniques dangerous due to the close proximity of agents to the subjects involved in the illegal activity. Therefore, I believe that physical surveillance, in and of itself, would not succeed in meeting the goals of this investigation. Although surveillance is a valuable tool it alone cannot provide the kinds of details that may be gleaned from criminal conversations between individuals involved in illegal activity. In addition, there is a risk of detection of future surveillance, which would

irreparably damage the investigation.

72)     Despite the limitations of physical surveillance, agents have attempted to conduct surveillance on CAMPBELL and MARCANO ROMAN. CAMPBELL resides at 2709 Tecoma Drive, Knoxville, Tennessee. The residence is located on a dead-end street. Although there are several residences on the same street, vehicle traffic in the area is sparse. The residents would easily observe law enforcement surveillance vehicles. Additionally according to CS-1, CAMPBELL often has other drug customers at his residence waiting to obtain cocaine. During controlled purchases, surveillance have been able to set up down the street and observe as vehicles arrive and depart from CAMPBELL's residence. However, the surveillance conducted at CAMPBELL's residence has been for limited time periods and during known controlled purchases of cocaine.

73)     MARCANO ROMAN previously resided at 4831 Summit Circle, Apartment 196, Knoxville, Tennessee. During multiple controlled purchases KCSO officers observed MARCANO ROMAN depart 4831 Summit Circle, Apartment 196, Knoxville, Tennessee, and travel to CAMPBELL's residence during the controlled purchases. However on November 9, 2020, KCSO officers learned that MARCANO ROMAN was evicted from his apartment for non-payment and narcotics after property managers discovered a large quantity of marijuana in MARCANO ROMAN's apartment. Officers later learned that MARCANO ROMAN began spending nights at an apartment complex located at 4000 Pleasant Ridge Road, Knoxville, Tennessee. A utility check of known associates of MARCANO ROMAN revealed that Eliana MARTINEZ has utilities at apartment B4.

74)     On January 20, 2021, USPIS notified agents that a package from Puerto Rico was scheduled to be delivered to "MARCOS PAGAN" at 4000 Pleasant Ridge Road, Apartment B-4,

Knoxville, Tennessee. Agents conducted surveillance as the package was delivered and observed MARCANO ROMAN take possession of the package. MARCANO ROMAN took the package into the apartment. Approximately eight minutes later, MARCANO ROMAN walked out of the apartment, placed the package into his Red BMW sedan bearing Tennessee license plate 2W29P7, then walked back into the apartment. Approximately 10 minutes later, MARCANO ROMAN departed the apartment complex in his Red BMW sedan and travelled to 552 Loop Road, Knoxville, Tennessee[18].

75)     On November 10, 2020, officers with KCSO obtained a tracking order to install a GPS tracker on MARCANO ROMAN's red 2000 BMW 38i and white 2004 Honda Civic. Officers never located the white 2004 Honda Civic and the tracking device was only placed on the red 2000 BMW 38i. On December 10, 2020, the initial tracking order expired and agents renewed the tracking order for MARCANO ROMAN's red 2000 BMW 38i which expired on January 10, 2021. The use of the GPS tracking devise assisted law enforcement with physical surveillance. Although law enforcement was able to obtain locations that MARCANO ROMAN travelled, without additional information law enforcement cannot determine the nature of MARCANO ROMAN's business at such locations. Furthermore, during the controlled purchase on November 30, 2020, MARCANO ROMAN travelled to CAMPBELL's residence in a black Ford Escape bearing Tennessee license plate 8T06R5, a vehicle registered to Eliana MARTINEZ, at 3305 Tazewell Pike, Apartment 23, Knoxville, Tennessee. Based on these experiences, we believe that ROMAN regularly and unpredictably uses other vehicles.

76)     Additionally agents have discussed obtaining telephone geo-location orders to assist with

---

[18] Data from the GPS tracking device, indicated that MARCANO ROMAN has travelled to 552 Loop Road, Knoxville, Tennessee on multiple occasions. Open source databases indicate 552 Loop Road, Knoxville, TN, is a rental property.

physical surveillance. Although this is an excellent tool and investigative technique, telephone geo-locations have limitations. Most service providers including Verizon Wireless often only provide geo-location information once every 15 minutes. As described herein during many instances the controlled purchases occurred in under 15 minutes. Additionally, with telephone geo-location alone, law enforcement would only be able to obtain locations a particular device travelled, without additional information law enforcement would not be able determine the nature of business at such locations.

77)     Even if agents were able to maintain constant surveillance, they could only learn where CAMPBELL and MARCANO ROMAN go during their day-to-day travels. Agents could not see what occurs when CAMPBELL or MARCANO ROMAN entered a location. This is why traditional surveillance alone will not succeed in meeting the goals of this investigation. Without the interception of communications, physical surveillance has limited utility. The interception of wire communications occurring over **Target Telephone 1** would likely allow agents to learn significantly more information regarding the organization's narcotics trafficking operation and allow surveillance to be utilized effectively when events that warrant action transpire.

### B.     UNDERCOVER AGENTS AND COOPERATING SOURCES

78)     CS-1 has been used in this investigation and has been helpful in meeting some of the goals of the investigation. However, it has been my experience that drug traffickers are careful about introducing outsiders to other members of the organization. Even more important, they are careful to limit and compartmentalize the knowledge that each member, especially new members, has of the organization. This prevents members from having enough information to do substantial harm to the organization in the event that they decide to cooperate with law enforcement.

79)     In this investigation, CS-1 has been able to maintain contact with CAMPBELL, which enabled CS-1 to arrange, at the direction of law enforcement, multiple narcotic purchases from CAMPBELL.  Agents believe CS-1 could set up further narcotic purchases with CAMPBELL, but CS-1 would continue to be treated as merely a purchaser of narcotics, and CAMPBELL would always be the point of contact, which would prevent agents from learning the full extent of the DTO.

80)     CS-1 has observed MARCANO ROMAN during controlled purchases at CAMPBELL's residence and has even conducted the exchange of money for drugs with MARCANO ROMAN directly while CAMPBELL was present.  CS-1 is not in a position of trust that MARCANO ROMAN would deal directly to CS-1.  CS-1 has not been provided with MARCANO ROMAN's telephone number and has to negotiate and arrange the purchases of cocaine through CAMPBELL.

81)     CS-2 provided agents with historical information regarding MARCANO ROMAN and his historical dealings.  CS-2 identified MARCANO ROMAN as a source of supply in two different cases in which CS-2 previously assisted the KCSO.  CS-2 is not currently in contact with MARCANO ROMAN.  Additionally, CS-2 does not have current contact information for MARCANO ROMAN.

82)     In my experience with drug traffickers I have seen that members of this type of organization are suspicious and unwilling to meet new individuals.  At this point in the investigation, it is unlikely that additional confidential sources or an undercover agent could successfully gain further information of the DTO.  It has been my experience that drug traffickers are careful about interaction with individuals they do not know or introducing outsiders to other members of the organization.  In my experience, drug trafficking members of

this type of organization are very careful with whom they talk, and they are suspicious and unwilling to meet new individuals. Even is a UC is successfully introduced, members of this type of organization are carful to limit and compartmentalize the scope of the organization and the knowledge of new members so that new members cannot do substantial harm to the organization. Therefore, it is highly unlikely that a UC will be able to successfully infiltrate this organization and meet the full objective of the investigation.

## C. CONSENSUAL MONITORING

83)     There are currently no cooperative witnesses, confidential sources, undercover agents, or officers who have infiltrated the CAMPBELL organization on a level that can pro-actively provide the information and evidence necessary to dismantle the entire conspiracy. Although CS-1 has recorded numerous conversations with CAMPBELL to order and/or purchase drugs, and referenced drug transactions, these recorded conversations did not reveal any inner workings of CAMPBELL's and MARCANO ROMAN's drug trafficking organization. CS-1 ability to continue contact with CAMPBELL or other members of the drug trafficking organization in this manner is limited, as recorded contacts have revolved around the purchase of drugs. I believe CS-1 is not currently privy to the specific dealings of CAMPBELL and other conspirators dealing with CAMPBELL. Based on previous interviews, and the investigation, I believe that CAMPBELL is primarily supplied cocaine by MARCANO ROMAN, but even with consensual recordings, I will not be able to develop further information to the level necessary to identify MARCANO ROMAN's source of supply. Therefore, consensual recordings, while I believe will reveal evidence of CAMPBELL's and MARCANO ROMAN's involvement, will not be a viable alternative to the wire surveillance requested herein.

## D. INTERVIEWS

84) Other than CS-1 and CS-2, agents have not had the opportunity to interview any other member of the MARCANO ROMAN and CAMPBELL DTO. I believe that any attempt to interview additional members of the DTO at this time in the investigation would be premature, and would not be productive. In fact, the use of interviews is more likely to harm the investigation than to further it because interviews would alert the members of the conspiracy to the ongoing investigation, making the investigation more difficult and dangerous. In addition, those individuals engaged in illegal conduct would most likely refuse to participate in interviews, or would minimize their involvement with the DTO.

### E. MAIL COVERS

85) United States Postal Inspection Service (USPIS) has assisted and are a participating agency in this investigation. In November of 2020, Postal Inspector Wendy Boles was contacted in reference to MARCANO ROMAN. Inspector Boles researched all known addresses associated with MARCANO ROMAN in and around Knoxville, TN and discovered many locations that had received USPS parcels from Bayamon, Puerto Rico and vicinity. Inspector Boles placed a Mail Watch on the subject addresses for parcels originating in Puerto Rico. Only the outside cover of the incoming mail is photocopied, which has helped agents to identify suspected links between MARCANO ROMAN and possible associates in Puerto Rico. Postal Inspector Boles dressed as a postal delivery person did a controlled delivery of a suspicious parcel from Puerto Rico on January 20, 2021, to MARCANO ROMAN. MARCANO ROMAN took the package but the delivery did not reveal what was in the subject parcel. A mail cover does not record the identity of all correspondence to the listed address because there are private carriers that may drop off packages that are not subject to the mail cover. Therefore, the mail covers have been of limited use in this investigation. Furthermore, this type of evidence does not

specify the roles and participation in the conspiracy of the persons sending correspondence to the target locations. The mail covers have provided leads for agents to further investigate. The mail covers obtained have not provided the necessary investigative detail necessary to accomplish the goals of the investigation.

## F.     SEARCH WARRANTS

86)     Search Warrants is an investigative tool that can provide valuable evidence. In this investigation, Agents identified CAMPBELL's residence as one location that CAMPBELL and MARCANO ROMAN conduct drug transactions. However it is believed that CAMPBELL merely coordinates these transactions and does not have large quantities of cocaine at the residence. During each controlled purchase described herein, CS-1 obtained the cocaine from MARCANO ROMAN who either arrived at CAMPBELL's residence immediately prior to CS-1 or a short time after. Furthermore, agents have observed, through both physical and electronic surveillance, that MARCANO ROMAN bounces between multiple places. Without additional information, it is unknown where MARCANO ROMAN maintains his drug supply or drug proceeds. Finally, if agents were to execute search warrants of physical locations, it would likely prevent the future investigation of MARCANO ROMAN's supplier.

87)     In my experience, the most successful search warrants are done at the end of the investigation once each co-conspirator has been completely incriminated. It is my belief that it would be more productive to execute search warrants at the end of the investigation, once the stated goals of the investigation have been substantially archived and there is a better chance of dismantling this organization.

## G.     TRASH SEARCHES

88)     An investigative technique that sometimes provides valuable evidence is a "trash search"

or the collection and examination of discarded trash at a subject's residence. Agents have considered doing trash searches in this case. However, as discussed above, the location where CAMPBELL resides is in area that presents significant risk that agents conducting surveillance will be identified by targets of the investigation. These same risks exist in the context of collecting discarded trash. Additionally, CAMPBELL has multiple dogs at his residence at 2709 Tecoma Drive, Knoxville, Tennessee, which are likely to alert him to someone near his residence. During the controlled purchases, agents could hear the dogs barking as CS-1 arrived at CAMPBELL's residence.

89) MARCANO ROMAN currently resides at an apartment complex with community dumpsters for residents to place their trash. If agents attempted to retrieve trash from the community dumpsters, they would likely be spotted by other residents or targets of this investigation. Furthermore it would be difficult to differentiate MARCANO ROMAN's trash from that of the other residents.

90) It is not likely that a criminal case could be made against the DTO based on evidence from trash searches alone. Successful and competent DTO's like this one will likely be very cognizant of the trash they put out, and ensure that drug trafficking materials and supplies are disposed of in a private and discreet way. Additionally, as with other means of investigation, trash searches can only be done on suspects whose home address is known.

## H. GRAND JURY SUBPOENAS

91) At this stage of the investigation, I believe issuing grand jury subpoenas to the Target Subjects, or other individuals believed to be either involved in this conspiracy or associated with those involved, would not result in achieving the stated goals of this investigation. The Target Subjects and their associates, should they be called to testify before the grand jury, would likely

be uncooperative, lie, or invoke their Fifth Amendment privilege to not testify. It is not reasonable to believe that the Target Subjects would simply agree to incriminate themselves under oath because the potential penalties would be too severe.

92)     Additionally, issuing grand jury subpoenas would have the effect of alerting the members of the conspiracy, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence.

93)     Grants of immunity would not be appropriate at this state of the investigation because immunity could foreclose the prosecution of principal members of this conspiracy and would not ensure the receipt of truthful testimony before the grand jury. As with grand jury subpoenas, it is not logical to believe that the Target Subjects would simply agree to incriminate themselves even if presented with the possibility of immunity. In my experience, this technique is more successful at the end of the investigation when the Target Subjects would possibly choose to provide information or cooperate so as to reduce their sentences.

94)     There is no basis to believe that the use of grand jury subpoenas or immunity is currently feasible in this case, and no grand jury subpoenas have been issued to members of the DTO. For the foregoing reasons, use of grand jury subpoenas and immunity is unlikely to advance the government's investigative objective.

95)     On December 15, 2020, agents did issue a grand jury subpoena to Square, Inc. for records pertaining to CAMPBELL. Toll analysis of **Target Telephone 1** revealed CAMPBELL often receives SMS text messages from a telephone number associated to "CashApp," a service of Square, Inc. At this time agents have not received a return of records from Square, Inc.

96)     Agents are working to identify additional banks and financial institutions used by the Target Subjects, if any, to issue Grand Jury subpoenas for records. However, though this

information, once received, is anticipated to assist in the investigation, it will not be sufficient to achieve all the goals of the investigation.

## I.      TELEPHONE TOLL RECORDS, PEN REGISTERS, & TRAP/TRACE DEVICES

97)      The use of toll records has proven to be beneficial in this investigation.  Data derived from the analysis of toll records has assisted law enforcement officers in identifying some of the telephone numbers that are in contact with **Target Telephone 1**.  Toll analysis of the phones used by CAMPBELL, MARCANO ROMAN, and other members of the DTO show they are in contact with multiple Puerto Rico telephone numbers.  However, this information is limited in that telephone records do not record the identity of the parties to the conversation, do not identify the nature or substance of the conversation, and do not differentiate between legitimate calls and pertinent criminal activity calls.  Specifically pen registers and toll records cannot indicate the time, place, or manner of delivery of controlled substance, or the methods of transportation and distribution of controlled substances.  Nor does this type of evidence specify the roles and participation of the persons initiating or receiving the telephone calls in the transportation and distribution network of which the Target Interceptees are a part.  At best, such evidence provides contact between telephone numbers subscribed to by certain people.

98)      On December 3, 2020, United States Magistrate Judge Debra C. Poplin, Eastern District of Tennessee, issued court orders authorizing the installation and use of pen registers for **Target Telephone 1** and 865-235-5008, used by MARCANO ROMAN.  Collection of call and text information over 865-235-5008 began on December 4, 2020.  Collection of call and text information over **Target Telephone 1** began on December 9, 2020.  Toll records have been compiled from both the pen register and from records requested from Verizon Wireless and AT&T.  The pen register for **Target Telephone 1** continues to be active and is regularly

monitored.

99)     Although I have not been able to obtain subscriber information for some of the numbers in contact with **Target Telephone 1**, the identification of these subscribers is of limited value as the subscribers for many of these telephones are likely fictitious or do not convey who actually is using the telephone.  Toll records alone have not assisted greatly in identifying all the members of the organization, associates, customers, stash locations, or methods of operation used by the organization.

100)     In order to gather sufficient evidence to support a prosecution, it is necessary to know the contents of the calls made to and from **Target Telephone 1**.  The contents of the calls would assist me in learning the true identities of the traffickers, the nature and scope of the organization, the roles of the various participants in the organization, the source(s) of supply of the narcotics, the locations of stash houses for narcotics, the method of distributing the narcotics, and the methods and means of distributing and concealing the assets acquired from the organization's drug trafficking activities.  Further, the contents of the conversations would aid me in conducting surveillance and in obtaining search warrants when they would be beneficial and appropriate.

## J.     FINANCIAL INVESTIGATION

101)     I have not obtained tax returns or credit reports for any of the members of the DTO. Although obtaining tax returns, credit reports, or other financial information may be helpful in tracing illicit proceeds collected by the Target Interceptees, It is highly unlikely that the information will lead to the identification of other members of the conspiracy.  Nevertheless, agents have run financial database checks on several members of the DTO to include CAMPBELL, and MARCANO ROMAN.  Based on this investigation, agents do not believe

CAMPBELL or MARCANO ROMAN have legitimate jobs. CS-1 stated CAMPBELL was unemployed and on disability for some reason that affects his natural walking abilities. MARCANO ROMAN was issued a business license on November 9, 2020 for "J&M's Painting and Home Innovations." MARCANO ROMAN and his brother, Juan Carlos Marcano, are on the business license. The license was issued in Knox County by the County Clerk (Business license number 0330429). At the time of this Affidavit, agents have not observed any indication of such a business by MARCANO ROMAN.

102)    On November 18, 2020, DEA subpoenaed Western Union Financial Services, Inc., in request of Western Union (WU) transactional information in which MARCANO ROMAN was the sender and/or payee, during the date range January 1, 2020, through November 17, 2020. Records received from Western Union indicated that MARCANO ROMAN sent $1,000 USC to Eridani VILORIO in the Dominican Republic in June of 2020.

103)    On December 21, 2020, DEA subpoenaed RIA Financial Services in request of transaction records in which MARCANO ROMAN was the sender and/or payee, during the date range of January 1, 2020, through November 24, 2020. Records received from RIA Financial Services indicated that MARCANO ROMAN sent a total of $7,150 USC to multiple recipients in Puerto Rico and Florida between July 3 and September 19, 2020.

104)    Through the court authorized GPS tracker on MARCANO ROMAN's vehicle, agents learned that MARCANO ROMAN's vehicle travelled to the Knoxville TVA Employees Credit Union facilities located at 10460 Kingston Pike, Knoxville, Tennessee and 11490 Parkside Drive, Farragut, Tennessee on multiple occasions. All occasions have been on the same day MARCANO ROMAN's vehicle travelled to and MARCANO ROMAN sent Fedex packages to Puerto Rico.

105)     In my experience, drug traffickers normally conduct business on a cash basis and often do not use traditional banking methods.  Based on my experience, I also know drug traffickers normally do not file income tax returns, file false income tax returns, and/or place assets in the names of other persons to prevent them from being located and identified.  Therefore, any tax returns obtained may provide only minimal insight into the actual financial activities of the Target Subjects.  At best, a financial investigation of a drug trafficker can serve to confirm the existence of unexplained wealth or unusual financial transactions.  However, absent the use of other investigative methods, simply obtaining financial information cannot achieve the goals of this investigation.

106)     Although agents have observed MARCANO ROMAN at two banks, CAMPBELL has not been followed to, or observed at, any banks or other financial institutions to date.  In this case, all of the money transactions from CS-1 to CAMPBELL and MARCANO ROMAN were with cash.  Additionally, in my experience, drug traffickers often use other persons' names to open accounts, conduct wire transfers, or open businesses in order to conceal their illegal operations.  Furthermore, drug traffickers unusually do not trust or discuss their financial endeavors with their drug customers or even their drug suppliers.   Even if agents were able to identify all accounts, businesses, and money laundering schemes used by this DTO, it would not provide the full organizational detail necessary to accomplish the goals of the investigation.

107)     Many members of the DTO remain unidentified, including many of the people to whom CAMPBELL and MARCANO ROMAN are distributing narcotics.  Therefore, I believe financial information gained through this investigation will be most useful in corroborating evidence obtained through other means after all of the organization's co-conspirators have been identified.

108)     I will continue to make every effort to use conventional investigative methods, such as

physical surveillance, confidential informants, pen registers, and financial information to further this investigation. However, the only viable means to neutralize a criminal entity is to focus on its communications. Communications is the lifeblood of a criminal organization, and therefore, to fully understand it and effectively dismantle it in its entirety, one must actively participate in its thought processes through the interception of its communication. A very effective method to investigate a criminal organization in its entirety is the Court-authorized interception of the communications utilized by members of the organization to command and control the operations conducted in furtherance of their ongoing criminal enterprise.

109) I believe that the authorization for wire communications interception, as discussed herein, would provide information identifying the full nature, extent, and volume of the drug trafficking activities of the DTO. Although some co-conspirators have been identified, there is probable cause to believe that many others are involved, including individuals responsible for transporting, warehousing, and distributing the narcotics and/or the proceeds derived from their sale.

110) The requested wire communications interceptions would likely produce information assisting investigators in the identification of smugglers, transporters, coordinators, and financiers involved in the distribution of narcotics, the individuals responsible for maintaining locations used to warehouse narcotics, the seizure of physical evidence, the identity of illegally obtained and therefore forfeitable assets, the identification and apprehension of other conspirators, the obtaining of incriminating communications between conspirators in furtherance of the conspiracy, and the conviction of the violators.

111) The requested interception, conducted in conjunction with the activities of physical surveillance and the execution of search warrants, will likely result in the necessary evidence to

convict a large number of the co-conspirators involved and successfully dismantle the organization. Without the requested interception, the traditional investigative techniques being employed would likely only either compromise the investigation prematurely or result in the conviction of only a limited number of subjects, thus the DTO would not be completely dismantled and would probably continue to engage in illicit activities by recruiting new members into the organization.

112) Therefore, I believe interception of the requested communications over **Target Telephone 1** is necessary, and permission is hereby requested to intercept wire communications of the Target Interceptees.

## XI. DURATION OF INTERCEPTION

113) This Affidavit is in support of an Application to intercept wire communications to and from **Target Telephone 1** until the attainment of the authorized objectives or, in any event, for a period not to exceed 30 days. It is requested, pursuant to 18 U.S.C. § 2518(5), that the 30-day period be calculated from the day on which investigative or law enforcement officers first begin to conduct an interception under the Order sought, or ten days after the Order is entered, whichever is earlier.

114) The authorization given is intended to apply not only to **Target Telephone 1** number listed above, but also to any other telephone number subsequently assigned to or used by the instrument bearing the same international mobile equipment identification number ("IMEI") used by **Target Telephone 1**, within the thirty-day period. The authorization also is intended to apply to the target telephone number referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use.

115)     As demonstrated by the facts contained in this Affidavit, the drug trafficking and money laundering conspiracy identified is on-going and involves the Target Interceptees.  This investigation seeks to identify the full scope, membership, and method of operation of the conspiracy.  Therefore, I request that interception not be ordered terminated upon the first interception of a conversation regarding narcotics trafficking or money laundering, but be allowed to continue until the full scope of the conspiracy, the persons involved, and their respective roles are determined, or for 30 days, whichever comes first.

## XII.    MINIMIZATION

116)     All communications intercepted over **Target Telephone 1** will first be listened to and minimized at the DEA office in Knoxville, Tennessee.

117)     The requirements regarding the minimization of interception will be strictly followed. Before initial interception begins, a meeting will be held for all monitoring agents and civilian contract personnel wherein the requirements of minimization will be discussed. Any monitoring agents and civilian contract personnel not in attendance will be instructed on the requirements of minimization at a later time prior to their involvement in any monitoring activity. A memorandum regarding minimization will be provided to all monitoring agents/contract personnel as well as a copy of the Court's Order authorizing interception. A copy of that Order and a minimization memorandum will remain posted at the listening site. Before agents/contract personnel begin to intercept communications, the agents/contract personnel will be required to sign a form indicating that the agents/contract personnel have read this Affidavit, the Court's Order authorizing interception, and the minimization memorandum and that the agent/contract personnel are familiar with the contents of the Order and will intercept wire communications in compliance with that Order.  Special attention will be paid to minimizing privileged

communications.

118) In the event that an intercepted conversation is in code or foreign language, and an expert in that foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception. In the event the translator is not a federal agent, the translator, whether a language-trained support employee or someone under contract with the government, will be under the direct supervision of a federal agent. If, however, a translator is not reasonably available, the following after-the fact minimization procedures have been established, pursuant to Title 18, United States Code, Section 2518(5):

(a) all such foreign language conversations will be intercepted and recorded in their entirety;

(b) as soon as practicable after such interception, these conversations will be reviewed and minimized by a translator under the guidance of a federal agent authorized to conduct the interception, after which an English translation of the pertinent criminal conversations will be furnished to the supervising federal agent.

119) All wire communications will be minimized in accordance with Chapter 119 of Title 18, United States Code, and all intercepts conducted pursuant to this Court's Order will terminate upon the authorized objectives or, in any event, at the end of thirty (30) days measured from the earlier of the day on which law enforcement officers first begin to conduct an interception under the Court's Order or ten (10) days after the Order is entered. Interception will be suspended immediately when it is determined, through voice identification, physical surveillance or otherwise, that none of the target subjects or any of their confederates, when identified, are participants in the conversation, unless it is determined, during the portion of the conversation already overheard, that the conversation is criminal in nature. Even if one or more of the target

subjects or their confederates, when identified, is a participant in a conversation, monitoring will be suspended if the conversation is not criminal in nature or not otherwise related to the criminal offense.

120)     Based on my experience, and that of other agents who have monitored and supervised wire interceptions, I believe that many drug related conversations may be part of an otherwise innocent conversation. Thus, lengthy conversations that appear to be non-pertinent will be periodically monitored to determine if the conversation has become criminal in nature.

121)     All intercepted wire communications will be recorded and all recordings will be securely preserved. Computerized logs will be prepared regarding the date, time of calls/communications, the parties involved, the subjects of the calls, and if and when minimization occurred. A report detailing the course of the interception will be filed with the Court on or about the fifteenth (15th) and thirtieth (30th) day following the commencement of interception, pursuant to the Court's Order. Particular emphasis will be placed on reporting minimization efforts as well as the need for the continued wire intercepts to the Court.


## XIII.     CONCLUSION

122)     I believe that the facts alleged herein establish that CAMPBELL and individuals associated with the CAMPBELL drug trafficking organization are engaged in an ongoing drug trafficking business and that evidence sought will be intercepted on a continuing basis following the receipt of authorization to intercept the particular communications that are the object of this request.  Therefore, it is requested that the interceptions not be required to terminate when the communications described herein are first intercepted, but be allowed to continue until communications are intercepted which fully reveal the scope of the enterprise, including the

identities and roles of participants in the above-described illegal controlled substance distribution and trafficking organization; the manner in which this illegal controlled substance distribution organization operates; the identification of the illegal conduct; the identification of the nature and methods of the managing and financing of the controlled substance distribution organization; the locations of any controlled substance stash and controlled substance warehouses; the suppliers of the controlled substance; the identification and location of future controlled substance transactions; the identification of controlled substance distribution methods; the identification and location of evidence of controlled substance transactions, financial records and other records reflecting the occurrence of controlled substance transactions, and monies being used to finance and conduct the controlled substance transactions; and the identification of other individuals not yet identified who are participating in, directing, or deriving financial profit and benefit from the illegal controlled substance distribution business; and the identity of which telephone, telephones, and/or paging device or devices, if any, is or are being used by the above-named targets and other persons not yet identified, or for a period of thirty (30) days from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception pursuant to the Court's Order or ten days from the date the Order authorizing such interceptions is entered, whichever is earlier.

123) Finally, IT IS FURTHER REQUESTED that this Affidavit, the attached Application, the resulting Order and Orders to the Service Provider, and all reports submitted pursuant to this Order be sealed until further Order of the Court.

Peter G. Wooden
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on this the _____ day of February, 2021.

Honorable Thomas A. Varlan
United States District Judge